**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Arthur James Miceli, being duly sworn, hereby declare and state the following:

**Introduction**

1. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and Federal Rule of Criminal Procedure 41(a)(2)(C), as a Special Agent (SA) of the Federal Bureau of Investigation (FBI). I am empowered to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since August 2009. I am currently assigned to the FBI Cleveland Field Office located in Cleveland, Ohio. As a Special Agent, my duties include conducting investigations involving possible criminal violations of Federal laws, particularly those laws located in Title 18 of the United States Code. I have conducted numerous criminal investigations of individuals involved in violations of complex financial crimes, public corruption, fraud against the government, bank robbery, and violent crimes.

3. Based on the facts set forth in this affidavit, I respectfully submit this application and affidavit in support of an arrest warrant and criminal complaint charging DAMIEN DONNELL SAMPLE (hereinafter known as "SAMPLE") with Felon in Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8), and Distribution of a Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

4. The facts in this affidavit are based on my own investigation, review of documents and records, and information obtained from other law enforcement officers and individuals. Because this affidavit is submitted solely for the purpose of establishing probable cause for the

1

criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this criminal investigation. I have set forth only the facts necessary to establish the probable cause to support the issuance of the requested complaint and arrest warrant.

**FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE**

**Background**

5.	In December of 2023, a Confidential Human Source (hereinafter known as "CHS") provided law enforcement with information regarding DAMIEN SAMPLE as someone attempting to develop a group called "FELONATION" into a criminal enterprise.[1] According to the CHS, SAMPLE wanted to acquire firearms to conduct robberies, use the money from the robberies to purchase narcotics, sell the narcotics, and build a criminal enterprise.

6.	FBI Cleveland conducted a public records database check and found that SAMPLE pled guilty to multiple charges including, Aggravated Robbery, in violation of Ohio Revised Code, Section 2911.01 with a 3-year gun specification [F-1], and Attempted Murder with a Firearm, in violation of Ohio Revised Code, Section 2923.02 [F-1]. On April 26, 2002, SAMPLE was sentenced to 15 years of incarceration. Therefore, SAMPLE is a convicted felon and prohibited federally from possessing a firearm.

7.	Between December 2023 and October 2024, CHS had multiple telephone text communications with SAMPLE. The CHS identified the telephone number 216-699-5373 as belonging to and used by SAMPLE. FBI Cleveland conducted public record checks that indicated

---

[1] CHS provided law enforcement information regarding DAMIEN SAMPLE, YOLANDA BOWIE, MICHAEL JARMON and others who were conspiring to commit crimes as outlined within this affidavit. CHS assisted law enforcement by conducting consensually monitored recordings with SAMPLE and others. FBI Cleveland was able to corroborate much of this information independently through other investigative means. Affiant believes CHS' information to be credible and reliable within the context of the scope of provided information.

216-699-5373 was a Metro PCS pre-paid active wireless telephone number registered to "Sample, Damien."

**May 1, 2024, Drug and Firearm Purchase**

8.  On April 5th, 2024, SAMPLE sent CHS text images of suspected narcotics in pill form within a clear plastic bag. *See Image 1*. SAMPLE explained that he purchased them for $1 per pill and they could resell the pills at a cost of their choosing.



Image 1

9.  On April 29, 2024, CHS sent SAMPLE a text message saying, "I got $400, we need to set up a good time to meet up." SAMPLE responded with a text message stating, "Are trying to just get pills? Or pills and a tool?" CHS and SAMPLE then made arrangements to meet at SAMPLE's residence at the time (13013 Parkhill Ave, Upper, Cleveland, Ohio).

10. Public record checks conducted by FBI Cleveland indicated that 13013 Parkhill Ave, Upper, Cleveland, Ohio, corresponded to a Yolanda Bowie. CHS confirmed that SAMPLE's girlfriend's name was Yolanda and that SAMPLE was staying at her residence.

11. On May 1, 2024, FBI Cleveland conducted an operation utilizing CHS. This operation was consensually recorded with audio and video recording devices. Additionally, FBI surveillance monitored an audio/video transmitter worn by CHS. CHS was patted down for any items of contraband and counted any money on their person. CHS was then provided $400 in pre-recorded US currency and dropped off in the area of Buckeye Road and E. 130th Street, Cleveland, Ohio. CHS was under constant electronic monitoring and physical surveillance. CHS began walking towards SAMPLE's residence of 13013 Parkhill Ave, Upper, Cleveland, Ohio.

12. At approximately 2:23pm, the CHS arrived at 13013 Parkhill Ave, Upper, Cleveland, Ohio. SAMPLE answered the door, greeted CHS, and the two walked west on Parkhill Avenue. During this consensually audio and video recorded meeting, SAMPLE provided CHS with three plastic bags containing suspected narcotics. The following was stated:

   a. SAMPLE – "So, I know ya, ha, I can give you one… two… three hundred pills."
   b. CHS – "If that's what you can get."
   c. SAMPLE – "Yeah, yeah."
   d. CHS – "I said the two."
   e. SAMPLE – "I give you one and two."
   f. CHS – "Yeah."

13. At approximately 2:27pm, SAMPLE went back in the front door of his residence of 13013 Parkhill Avenue, Cleveland, Ohio, while CHS waited on the front porch. SAMPLE then exited the front door approximately 2 minutes later. During the meeting, the following was stated:

   a. SAMPLE – "It's in a bag, in a holster. We still. I am about to call Steve right now and get the other one, right now, right now. I'm not gonna wait and see. It's mine. And I really, the only reason, I'm like. I, I. She was like 'oh, you sell guns?' I was like, no, Rasheed in the nation. I don't sell guns. I don't have nothing to sell."
   b. CHS – "So you're about to be strapped, I'm gonna be strapped."
   c. SAMPLE – "I'm gonna get a mother fuckin chopper. A mother fuckin shotgun."
   d. CHS – "Where you gonna get some shit like that?"
   e. SAMPLE – "Steve he got it."

4

14. At approximately 2:30pm, SAMPLE provided CHS with a Romarm Carpati 380 Model 95 firearm with serial number A-3920, with two magazines, and a holster. In exchange, CHS provide SAMPLE with the pre-recorded $400 of currency.

15. FBI surveillance personnel observed with binoculars SAMPLE and CHS walking westbound on Parkhill Avenue. They observed a hand-to-hand exchange where SAMPLE provided CHS an item that could not be seen from their vantage point. These observations were made contemporaneously to the surveillance team listening to the transmitter worn by CHS.

16. CHS and SAMPLE then separated. CHS walked to a pre-designated location where CHS was picked up by FBI personnel and provided the Romarm Carpati 380 Model 95 firearm with serial number A-3920 and suspected narcotics to FBI personnel wearing protective gloves. The narcotics were of similar shape, size, color, and packaging as shown in the text image sent from SAMPLE to CHS discussed above.

17. FBI Cleveland provided the Romarm Carpati 380 Model 95 firearm with serial number A-3920 to the ATF who conducted a firearms trace of this weapon, which identified it as manufactured in "Turkiye" (Turkey) and imported into the United States by SDS Imports, LLC. Public records indicated that SDS Imports, LLC is a Knoxville, Tennessee, based firearms importing company that partners with companies to include Tokarev USA. Based on my training and experience and the information from ATF, I know that the firearm was manufactured outside of the State of Ohio and, therefore, that it travelled in interstate commerce.

18. FBI Cleveland entered the three bags of suspected narcotic pills into evidentiary storage and then sent to the Drug Enforcement Administration ("DEA") for laboratory chemical analysis of the substances.

19. The DEA provided a chemical analysis report for the three bags, consisting of:

   a. 106 tablets of Methamphetamine (calc. as Hydrochloride) consisting of a net weight of 30.08 g +/- 0.01 g.  The substance purity was 1.5% +/- 0.2%.
   b. 104 tablets of Methamphetamine (calc. as Hydrochloride) consisting of a net weight of 31.39 g +/- 0.01 g.  The substance purity was 1.2% +/- 0.2%.
   c. 104 tablets of Methamphetamine (calc. as Hydrochloride) consisting of a net weight of 33.8 g +/- 0.2 g.  The substance purity was 1.4% +/- 0.2%.

**June 2, 2024, Firearm Purchase**

20. On February 24, 2024, CHS provided FBI Cleveland an image from SAMPLE's open and public Facebook account.  *See* Image 2.  On this image were the words "Whise Est. 2021" along the top right and "Steven Johnson FEB 27, 2021" along the bottom left.  CHS identified the individual on the left as "Whise."



Image 2

21. On February 26, 2024, CHS reported that Steve Last Name Unknown aka "Whise" may have provided SAMPLE with two 380 pistols.

22. FBI Cleveland conducted a search of the Ohio Bureau of Motor Vehicles database for the name "Steven Johnson" as indicated in Image 2.  That search returned a Steven Allen

6

JOHNSON with a registered residence of 5415 Fairtree Rd, Bedford Heights, Ohio 44146. JOHNSON's driver's license photograph from his driver's license issued on January 21, 2021, is shown in Image 3 below:



Image 3

23. FBI Cleveland conducted public records checks of an open and public Facebook account for JOHNSON. The account profile name listed "Steven Johnson" as well as an alias "ENKI WHISE." JOHNSON's listed employment was "Enki at Nation of Whise."

24. FBI Cleveland conducted public record checks and determined that telephone number 216-334-3899 corresponded with a T-Mobile pre-paid telephone registered to Steven Allen JOHNSON.

25. Based on my training and experiences, JOHNSON's Facebook account demonstrates a connection between SAMPLE and JOHNSON. For example, JOHNSON's Facebook contact listed SAMPLE's social media account as a "friend." Further, on a January 1, 2021, JOHNSON posted on his social media account an image. That image had an emoji heart posted to it by SAMPLE's social media account.

26. On May 8, 2024, during a consensually monitored telephone call between CHS and SAMPLE utilizing his registered telephone number 216-699-5373, SAMPLE stated that "Steve"

has an AR in the box that is camouflage, two 9mm Taurus handguns, and a "plug." In my training and experience, a "plug" refers to someone who can supply illegal items such as drugs, firearms, and other contraband.

27.     On May 15, 2024, SAMPLE sent a text message to CHS. Within that communication, SAMPLE stated, "Yeah, it's important that we get all of Steve's hardware asap," and "I'm about to reestablish our connects on the inside." Based upon previous communications between SAMPLE and CHS, as well as my training and experience, I understand SAMPLE stating "hardware" as him referring to firearms.

28.     On May 23, 2024, SAMPLE and CHS had a text communication. This communication was regarding meeting up to go and purchase weapons from JOHNSON. The meeting was postponed due to JOHNSON's schedule. When CHS inquired to SAMPLE about the transaction occurring, SAMPLE provided CHS an image of two assault rifles and three handguns, *See* Image 4 (and Image 5 being a blown-up image of that text communication).



Image 4                                          Image 5

29. On June 2, 2024, FBI Cleveland conducted an operation with CHS, SAMPLE and JOHNSON. During that meeting, CHS was wearing a consensually monitored audio and video recording device. The FBI also provided CHS with $500 in U.S. currency. CHS picked up SAMPLE at 31013 Parkhill Avenue, Cleveland, Ohio, and drove to JOHNSON's residence of 5415 Fairtree Road, Bedford Heights, Ohio, 44146. CHS and SAMPLE were invited into JOHNSON house. Inside JOHNSON's house, CHS was shown several handguns, an AR-15, and a shotgun with American flag markings.

30. CHS and JOHNSON negotiated to purchase the shotgun with American flag markings at $600 and an additional $40 for ammunition. Since CHS only had $500, it was agreed that CHS owed JOHNSON the remaining $140 for the purchased shotgun and ammunition. CHS was provided the shotgun with American flag markings. Both CHS and SAMPLE then left JOHNSON's residence and then CHS drove SAMPLE to SAMPLE's residence.

31. At the completion of the operation, CHS provided the FBI with a Tokarev shotgun, Model TBP 12, caliber 12-gauge, with serial number 52-H23YB-026781, two (2) boxes of 12-gauge ammunition, and one (1) loaded magazine. The shotgun with American flag markings, *See* Image 6, which matched the shotgun of Images 4 and 5.



Image 6

32. On June 3, 2024, the ATF confirmed that Steven Allen JOHNSON with social security number ending in 1572 was not registered in the ATF's Federal Licensing System for firearms.

33. ATF records checks of this Tokarev shotgun with serial number 52-H23YB-026781 indicated it was purchased on March 2, 2024, by David Michael HAGGINS, who lives at 8605 Rosewood Ave, Cleveland, Ohio, 44105, with the date of birth 4/7/1987, from Fin Feather Fur Outfitters located at 18030 Bagley Road, Middleburg Heights, Ohio 44130.  There were 92 days from the date of purchase to the FBI recovery of this firearm and only 82 days from purchase to the image provided by SAMPLE on May 23, 2024.  The Tokarev shotgun was not reported stolen.

34. The ATF conducted records check to identify other firearms purchased by HAGGINS:

   a. On February 8, 2024, HAGGINS purchased a Taurus G2C, 40 caliber pistol with serial number AEM924810 and a SCCY Industries, LLC CPX-2, 9mm caliber pistol with serial number C502053.  The Taurus G2C had similar characteristics to the handgun seen in Image 5.  There were 105 days from purchase to when SAMPLE provided Image 5 to CHS on May 23, 2024.

   b. On April 9, 2024, HAGGINS purchased two Taurus G3C, 9mm caliber pistols, with serial numbers AEM902527 and AEM902515. These firearms had similar characteristics to two of the handguns seen in Image 5.  There were 44 days from purchase to when SAMPLE provided Image 5 to CHS on May 23rd, 2024.

35. Separate from the FBI Cleveland investigation, the Cuyahoga County Sheriff's Office ("CCSO") recovered the SCCY Industries, LLC, CPX-2, 9mm caliber pistol with serial number C502053 on June 15, 2024, incident to a traffic stop.  This serial number matched the same

SCCY Industries, LLC CPX-2, 9mm caliber pistol with serial number C502053 listed above as sold to HAGGINS.  This firearm was not reported stolen.  The individual associated with the SCCY Industries, LLC, CPX-2, 9mm caliber pistol with serial number C502053 was prohibited by the state of Ohio from possessing a firearm and therefore, CCSO obtained an arrest warrant for him in violation of Ohio Revised Code, Section 2923.13 – Having Weapons While Under Disability.

36. ATF Special Agents and Intelligence Analysts were provided Image 5.  Based on their training and experience, they identified the three (3) handguns within this image as potentially being Taurus brand handguns.  They indicated the yellow magazine slide followers and hand grip design as characteristic of Taurus weapons and accessories.

37. The FBI conducted a public records image search for Taurus G2C and G3C pistols as identified by the ATF purchase history of HAGGINS listed above.  The returned images of Taurus G2C and G3C pistols had similar characteristics of those three (3) black handguns seen in Image 5.

38. On or about June 5, 2024, SAMPLE sent CHS a text message stating, "Bout to put my hand the chopper and the side arm.  You have the shotty and a side arm. Right?  I'm planning put some plays for us."  Based upon previous communications between SAMPLE and CHS as well as my training and experience, I understand SAMPLE stating "chopper" to mean an assault rifle and "plays" to mean robberies.  Further, SAMPLE inquired about the remaining $140 balance CHS owed for the shotgun purchased on June 2, 2024.

39. On or about June 8, 2024, JOHNSON sent CHS a text message from telephone number 216-334-3899, a telephone number known to CHS as JOHNSON aka "Wise."  JOHNSON

11

inquired about when they were going to meet. CHS informed FBI Cleveland Special Agents that this was in reference to the remaining $140 balance for the shotgun.

40. On or about June 9, 2024, SAMPLE sent CHS a text message stating "I talked with Steve about the funds. My bad for not sending that text. We need to touch bases." Based upon my training, experience, and the facts of this investigation, I understand this as SAMPLE discussed the remaining $140 balance for the shotgun with JOHNSON.

41. On or about June 9, 2024, JOHNSON sent CHS a text message stating "Yo were in such a hurry to leave you didn't hear the terms of my loans I told D to tell you when you got to the car I charge 20 for the wait and 10 dollars a day when you late and I don't hear from you all you had to do was call Friday tell me you didn't have it and you were working on it but the face you didn't respond till D [meaning SAMPLE] hit you up show me your character I only fucked with you because of him you lied to me from the jump I don't lie about anything I'm not scare of no one so no one can send me threats and that's going to effect a thing so it's Sunday still haven't had conversation so we at 180 that day interest stops when you let me know when I'm getting paid and talk to me like a person don't like slid shit from niggas supposed to be down." Based upon my training, experience, and the facts of this investigation, I understand this as JOHNSON applying interest to CHS for the remaining $140 balance for the shotgun.

42. On or about June 25, 2024, CHS contacted JOHNSON and inquired if he had Venmo.[2] JOHNSON stated that he only had CashApp, another peer-to-peer payment application. JOHNSON advised CHS that CHS could pay "D," meaning SAMPLE, and that SAMPLE would

---

[2] Venmo is a peer-to-peer payment application that allows account holders to pay other account holders such as friends, local businesses, charities, etc.

provide JOHNSON the money. CHS stated that CHS would provide $200, to which JOHNSON agreed.

43. On June 26, 2024, CHS called SAMPLE stating CHS was going to send $10 to SAMPLE's VENMO account titled $DamienDonnell as a test and then the remaining $190. CHS then sent $10 to SAMPLE's Venmo account. CHS called SAMPLE to confirm the $10 payment was received, to which SAMPLE verified. CHS then sent the additional $190 to SAMPLE. These transactions are shown in Image 7 below:



Image 7

44. On June 26, 2024, CHS sent a text message to JOHNSON showing proof that payment was sent to SAMPLE as seen in Image 8 below:



Image 8

**October 2, 2024, Drug Purchase**

45. On August 2, 2024, CHS reported that SAMPLE had a fight with his girlfriend [BOWIE] and had moved to 869 Eddy Road, Cleveland, Ohio, 44108.  He was staying with someone named "Duke" (later identified by CHS as Michael JARMON).

46. On September 17, 2024, SAMPLE sent CHS a text message image of numerous green and blue pills.  *See Image 9*.

14



Image 9

47. On September 16, 2024, CHS had a consensually monitored telephone call with SAMPLE. During this telephone call, the following was stated:

   a. SAMPLE – Oh yeah, just for the record, the one that I showed you.
   b. CHS – Yeah
   c. SAMPLE – For the team. For the team. They've been going. I've been going $1.50 a choice, you know, whether you buy one or a handful, you can go a buck fifty, you can go a little bit less but. I'm just letting you know that we as a group, as a group, you know I buy them, I get em like 1000 at a time. They still, they running like $1.10 apiece.

48. On September 22, 2024, CHS had a consensually monitored telephone call with SAMPLE. During this telephone call, the following was stated:

   a. CHS – You still sitting fat on those things?
   b. SAMPLE – Oh yeah, its been evolving. Oh yeah yeah. The only way to get a jar from me, you have to be in the organization. Fuck that.
   c. CHS – Yeah, what a jar consist of? How many?
   d. SAMPLE – 100
   e. CHS – 100
   f. SAMPLE - Yeah
   g. CHS – And what's your price on that?
   h. SAMPLE – I tell you what. You know. I've been going. I've been going. I've been going inside the crew, I've been going 150, 120. You know, 150. Don't get

15

me wrong. If a nigga really short on dough, then I still can work with him. But at the same time, I'm building a kiddy too.

49. In my training and experience, I understand that CHS meant to inquire if SAMPLE still had more narcotics. SAMPLE confirmed that he did and that he only sells to those individuals in his crew. SAMPLE sells the pills in the quantity of 100 per container. SAMPLE then stated that the price per pill was $1.50 to $1.20.

50. Continuing on the recorded telephone call, SAMPLE and CHS then entered into an arrangement for CHS to purchase about $600 or $700 worth of pills. SAMPLE stated that if the purchase was that much, he, SAMPLE, might have to obtain a re-up. I understand a "re-up" to be a resupply of narcotics from his supplier.

51. On September 23, 2024, I conducted physical surveillance of 869 Eddy Road, Cleveland, Ohio. Parked in the driveway was a green Dodge Ram 4x4 truck bearing Ohio license plate KDM 4920. FBI Cleveland conducted record checks of the Ohio Bureau of Motor Vehicle database regarding this license plate, which was registered to JARMON.

52. On September 24, 2024, SAMPLE sent CHS a text message to reconfirm his address was "869 Eddy Road." CHS then confirmed that he had $450 for SAMPLE. CHS and SAMPLE made arrangements to meet on September 26, 2024.

53. On September 26, 2024, SAMPLE was unable to leave work and attempted to change the meeting location with CHS. Due to the change in the planned FBI operation, the CHS was instructed to postpone the transaction. CHS and SAMPLE exchanged several text communications to postpone the meeting until Wednesday, October 2, 2024.

54. On September 30, 2024, CHS sent SAMPLE a text message to confirm October 2 around 3:30pm. SAMPLE confirmed with "Bet."

55. On October 2, 2024, SAMPLE sent CHS a text message stating, "What's up?" CHS responded that CHS would meet after work at Duke's place and that CHS had money in CHS's car. SAMPLE confirmed with "Bet." CHS stated to the Affiant that CHS knew Duke's place to be 869 Eddy Road, Cleveland, Ohio.

56. On October 2, 2024, FBI Cleveland conducted an operation utilizing CHS. This operation was consensually recorded with audio and video recording devices. CHS was patted down for any items of contraband and counted any money on their person. CHS was then provided $450 in pre-recorded US currency and audio/video recording equipment and a transmitter. CHS then drove to 869 Eddy Road, Cleveland, Ohio. CHS was under constant electronic monitoring and physical surveillance.

57. CHS began walking towards SAMPLE's new residence of 869 Eddy Road, Cleveland, Ohio. At approximately 4:51pm, the CHS arrived at 869 Eddy Road, Cleveland, Ohio and knocked on the door. Additionally, FBI surveillance monitored an audio/video transmitter worn by CHS. SAMPLE opened the door, welcomed CHS, and invited CHS inside the residence. Seen on the audio/video recording sitting at a dining room table was JARMON, BOWIE, and then later, SAMPLE. Both BOWIE and JARMON greeted CHS as CHS entered the room. During the meeting, CHS provided SAMPLE with the $450.00. SAMPLE retrieved a red and black cinched bag and began to remove bags of pills. BOWIE assisted SAMPLE in counting out 300 pills. The following was stated:

    a. SAMPLE – Yolanda count fast too. We… We… A few times, we had to count up 1000 things. You tell me, you try to count them bitches out when a niggas tryin to give you about 850 and there's supposed to be 1000 of them things. I'm like my nigga.
    b. BOWIE – I was uncomfortable at first… Unintelligible ("UI")
    c. SAMPLE – Count them beans that, shit is different than counting money. You be like…
    d. JARMON – Hell yeah.

17

  e. SAMPLE Lame ass mother fuckers, I'm like you using a scale.
  f. JARMON – Use them money counters for sure.

58. A few minutes later during the same meeting, the following was stated:

  a. BOWIE – Is this supposed to be a certain amount.
  b. SAMPLE – 100.
  c. BOWIE [counting] This is over 100.
  d. CHS – Yeah.
  e. BOWIE – This is 100 right here.  109.  I mean, this is 1 short.

59. SAMPLE and BOWIE then recounted the pills into groups of 100.  SAMPLE then mixed 300 pills into three bags and provided them to CHS.

60. At approximately 5:10pm, CHS exited the 869 Eddy Road, Cleveland, Ohio with three bags of suspected narcotics provided by SAMPLE.

61. CHS and SAMPLE then separated.  CHS walked to a pre-designated location where CHS was picked up by FBI personnel and provided the firearm and suspected narcotics to FBI personnel wearing protective gloves.  The suspected narcotics collected by CHS were of similar shape, size, color, and packaging as shown in the text image sent from SAMPLE to CHS discussed above.  *See Image 10.*



Image 10

62. On October 3, 2024, FBI Cleveland entered the three bags of suspected narcotic pills into evidentiary storage and separated them into same shape, size, and color. Nine evidence items were then sent to the DEA for laboratory chemical analysis of the substances.

63. The DEA provided a chemical analysis report for the below evidence items, consisting of:

   a. 2 white round tablets consisting of Methamphetamine with a net weight of 0.583 g +/- 0.002 g.
   b. 4 purple round tablets consisting of Methamphetamine with a net weight of 1.193 g +/- 0.002 g.
   c. 2 red round tablets consisting of Methamphetamine with a net weight of 0.610 g +/- 0.002 g.
   d. 122 green tablets consisting of Methamphetamine with a net weight of 54.820 g +/- 0.002 g. The substance purity was 5.9% +/- 0.7%. Additionally, Fentanyl was identified in 9 unit(s) tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance(s).
   e. 17 green round tablets consisting of Methamphetamine with a net weight of 2.249 g +/- 0.002 g. The substance purity was 6.6% +/- 0.7%.
   f. 29 red small round tablets consisting of Methamphetamine with a net weight of 3.796 g +/- 0.002 g. The substance purity was 5.3% +/- 0.6%.
   g. 23 orange small round tablets consisting of Methamphetamine with a net weight of 3.070 g ± 0.002 g. The substance purity was 7.1% +/- 0.8%.

64. At the time of drafting this affidavit, we are still awaiting results for the following submissions:

   a. 69 and a half purple tablets
   b. 31 white small round tablets

**CONCLUSION**

65. Based on the foregoing, there is probable cause to believe that, in the Northern District of Ohio, on May 1, 2024, SAMPLE, knowing he had been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm that had travelled in interstate commerce, in violation of Title 18, U.S. Code, Sections 922(g)(1) and 924(a)(8). There is also probable cause to believe that on or about May 1, 2024, and October 2, 2024, in the Northern District of Ohio, SAMPLE distributed a controlled substance, in violation of Title 21, U.S. Code, Sections 841(a)(1) and (b)(1)(C).

FURTHER YOUR AFFIANT SAYETH NOT.

_____
Arthur J. Miceli, Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means [Fed. R. Crim. P. 4.1 and 41(d)(3)] on this 4th day of November, 2024.



James E. Grimes Jr., United States Magistrate Judge